UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Glen Gidley

     v.                           Civil No. 07-cv-31-JL
                                       Opinion No. 2009 DNH 094

Anthony Oliveri and
Juan Valerio

**O R D E R**

When the Salem Police Department brought charges against Salem Manufactured Homes, LLC, its only identifiable officer or affiliate, Glen Gidley, was "booked" at the police station and issued a summons.  He sued the officers involved, claiming false arrest and false imprisonment in violation of both the federal and state constitutions, as well as state common law torts.  The defendants assert the qualified immunity defense, which is the main focus of the parties' cross motions for summary judgment.

This court has jurisdiction under 28 U.S.C. §§ 1332 (federal question) and 1367 (supplemental jurisdiction).  After oral argument, the court grants the defendants' motion for summary judgment on all counts.  The defendants are entitled to qualified immunity on the federal claims under 42 U.S.C. § 1983 because the booking-and-summons of Gidley did not implicate a clearly

established Fourth Amendment right such that a reasonable police officer would have understood that the procedure violated it.

I.    **APPLICABLE LEGAL STANDARD**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).

Both parties have moved for summary judgment on the federal civil rights claims under § 1983 (Counts 1 and 2).  "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004).  Because only the defendants have moved for summary judgment on the remaining state law claims, however, the court regards the plaintiff, Gidley, as the "nonmovant," and will indulge all reasonable inferences in his favor.  See Mulvihill, 335 F.3d at 19.

2

## II.  **BACKGROUND**[1]

On November 12, 2004, Melissa Leclair went to the Salem
Police Station to complain that her vehicle had been damaged a
few days earlier by debris from the uncovered load of a dump
truck.  Defendant Officer Anthony Oliveri was assigned to take
and handle her complaint.  Ms. Leclair reported, both verbally
and through written statements she and her mother provided, that
on November 9, 2004, she was driving east on Route 111 in Salem
behind a commercial dump truck.  Her mother accompanied her in
the passenger seat.  Debris from the dump truck's uncovered load,
including dirt, rocks and a tennis ball, struck her vehicle,
damaging her hood and cracking her windshield.  There is
conflicting evidence regarding her own vehicle's and the truck's
rate of travel, as well as whether their speeds were conveyed by
Ms. Leclair to Officer Oliveri, but it is undisputed that Officer
Oliveri did not consider the truck's speed when proceeding with
his investigation and preparation of the criminal complaint at
issue.

---

[1]  Because only Counts 1 and 2, which contain but are not
limited to federal civil rights claims, are the subject of
summary judgment motions by both parties, and only the defendants
have moved for summary judgment on the remaining claims, the
court regards Gidley as the "nonmovant," and states the facts in
the light most favorable to him.  Id.

Possibly as a result of Ms. Leclair's flashing her "high beams" at the truck, its driver pulled over, allowing her to pass, at which point Ms. Leclair's mother noted the truck's license plate number and the words "Salem Manufactured Homes" emblazoned on the side.

Ms. Leclair reported to Officer Oliveri that she had telephoned Salem Manufactured Homes to seek redress for the damages to her vehicle, and the receptionist there informed her that the company's "owner" was plaintiff Glen Gidley.  The receptionist told Ms. Leclair that none of the company's trucks had traveled on that stretch of Route 111 on the date she had reported (Ms. Leclair had mistakenly provided the wrong date).  When she further told Ms. Leclair to submit her claim to her insurance company, Ms. Leclair decided to report the matter to the police.  Neither Gidley nor anyone else from the company returned Ms. Leclair's call or otherwise contacted her.

Officer Oliveri inspected Ms. Leclair's vehicle, noting the cracked windshield and dents on the hood.  He also confirmed, based on the license plate number provided by Ms. Leclair, that the truck was registered to Salem Manufactured Homes.  Ms. Leclair also provided a damages estimate.

Officer Oliveri was familiar with Salem Manufactured Homes and Gidley, in part because Gidley was involved in a romantic,

4

cohabitative relationship with the former wife of Oliveri's
brother, Richard Oliveri, also a Salem police officer.  Gidley
does not allege, and there is no evidence to suggest, that
Officer Oliveri's assignment to handle the Leclair complaint was
anything other than coincidental.  The same is true of Officer
Valerio's eventual involvement.[2]

Concerned about the appearance of impropriety, but not about
his ability to objectively investigate the complaint, Officer
Oliveri immediately asked his supervising sergeant to assign
another officer to the matter.  The sergeant declined to remove
Officer Oliveri from the case and told him:  "Conduct yourself
professionally and do your job."

Rather than immediately continuing with a criminal
investigation, and while Ms. Leclair was still at the station
writing out a statement, Officer Oliveri telephoned Salem
Manufactured Homes in an attempt to resolve her property damage
claim.  The same Salem Manufactured Homes receptionist (who later

---

[2]  Gidley alleges a "pattern of harassment" by both
defendant officers and Officer Richard Oliveri prior to the
investigation of the Leclair complaint.  The court, applying the
summary judgment standard, infers in the plaintiff's favor that
these events, which appear to be a short series of juvenile,
somewhat annoying encounters not initiated or escalated by
Gidley, actually took place.  The parties agreed at oral
argument, however, that the "harassment events" have no bearing
on the § 1983 claims.

testified that Officer Oliveri was polite to her), challenged Ms. Leclair's account based on the initial mix up regarding the date of the incident.  She also declined to provide Officer Oliveri with any assistance or information, including the identity of the truck driver.

Officer Oliveri reviewed New Hampshire's "spillage" statute[3] and learned that it allowed for the prosecution of both "a

---

[3]  New Hampshire's "spillage" statute provides:

**266:72 Spillage of Material**

I.    No vehicle shall be driven or moved on any way unless such vehicle is so constructed or loaded as to prevent any of its load from dropping, sifting, leaking or otherwise escaping therefrom, except that sand may be dropped for the purpose of securing traction or water or other substance may be sprinkled on a way in cleaning or maintaining such way.

* * *

III.  Any person who violates the provisions of this section shall be guilty of a violation if a natural person, or guilty of a misdemeanor if any other person.  Any person shall be liable to the state or town for any damage done to the way by spillage.

N.H. Rev. Stat. Ann. 266:72 (Supp. 2008).  The statute was amended in 2004 and 2006 in ways not relevant to this case. Paragraph V of the statute contains exceptions applicable to paragraph II and II-a, including one rendering those paragraphs inapplicable to vehicles traveling under 30 miles per hour.  Id. at § 266:72, V(c).  The 30 m.p.h. minimum does not apply to paragraph I.

natural person" and "any other person," i.e., a corporation or
other business organization.  See N.H. Rev. Stat. Ann. § 266:72,
III (Supp. 2008).  Not having identified the driver of the truck
(and thus unable to charge him individually), but not knowing how
to initiate a prosecution against an entity like Salem
Manufactured Homes, Officer Oliveri sought advice from prosecutor
Donald Blaszka.  At that time, Blaszka, a 1999 graduate of
Suffolk University Law School and member of the New Hampshire Bar
since 2000, had over four years experience as an Assistant
Rockingham County Attorney.  His responsibilities included
handling Salem cases and assisting the Salem Police Department.

Responding to Officer Oliveri's request for advice in
bringing a charge against a limited liability company, Assistant
County Attorney (ACA) Blaszka advised him to obtain an arrest
warrant based on a complaint charging the company, Salem
Manufactured Homes "care of" its "owner," Gidley.[4]  ACA Blaszka

---

[4]  Gidley's role as the "owner" of Salem Manufactured Homes
was the subject of much discussion during the investigation and
prosecution of the company, and the debate continued during this
litigation.  The issue does not strike the court as particularly
controversial.  In truth, limited liability companies under New
Hampshire law do not have "owners" per se.  They have "members,"
the only individuals with any interest in the companies' profits,
distributions, or assets, see N.H. Rev. Stat. Ann. § 304-C:1, X
(2005); see also id. § 304-C:38-46, and "managers" who must be
chosen by the members in the manner provided in the limited
liability company agreement, and whose responsibilities are
limited to those set forth in the agreement.  See N.H. Rev. Stat.

7

advised Officer Oliveri that "the laws of the arrest were that since it didn't occur in his presence, he would have to seek an arrest warrant, fill out an affidavit, and go before a Justice of the Peace."  He further advised that "if there's an arrest warrant that has been obtained, he need[ed] to go execute it."

ACA Blaszka's advice was based on the confluence of the following factors:  (1) a violation charge against a natural person--which unlike a misdemeanor charge, would not have required an arrest or warrant--was not possible because the truck driver had not been identified; thus, a misdemeanor against Salem Manufactured Homes was the only available charge; (2) a Rockingham County Attorney's Office policy, the existence of which is undisputed, generally required arrests in misdemeanor prosecutions; (3) a New Hampshire statute limiting the permissibility of warrantless misdemeanor arrests to

---

Ann. § 304-C:1, IX; see also N.H. Rev. Stat. Ann. § 304-C:31, I. Regardless of these distinctions under New Hampshire law, there appears to be no question, based on all of the documentary and testimonial evidence in the record, that Gidley was the company's sole member and sole manager.  At his deposition, Gidley identified himself as both a manager and member of the company, and was unable to identify any other members.  Salem Manufactured Homes' receptionist identified Gidley to Ms. Leclair, and at her deposition, as the company's "owner."  In layman's terms, a member of an LLC--especially a sole member--is the company's "owner."

circumstances not present here;[5] (4) precedent provided by a Rockingham County prosecution against a corporation, in which the superior court ordered corporate officers to appear in court for arraignment and to personally post bail in order to secure the corporation's presence at court proceedings;[6] and (4) approval provided by his supervisor, a more senior county prosecutor, ACA Patricia Conway.

ACA Blaszka then advised Officer Oliveri to telephone the New Hampshire Secretary of State's office to confirm that Gidley was the "owner" of Salem Manufactured Homes. Officer Oliveri's understanding of the information he received over the telephone from the Secretary of State's Office was that Gidley was, in fact, the "owner" of Salem Manufactured Homes, as reported to him by Ms. Leclair based on the company receptionist's statement to her. The Secretary of State's Office later informed the company's criminal defense attorney, in writing, that it would have been unable to confirm Gidley's "ownership" over the phone

---

[5] N.H. Rev. Stat. Ann. § 594:10. This provision requires arrest <u>warrants</u> in support of misdemeanor <u>arrests</u> committed outside the presence of a public officer; it does not, however, require arrest warrants in all misdemeanor <u>prosecutions</u>.

[6] <u>State v. Sun Ho Restaurants, Inc.</u>, Rockingham County Superior Court #2000-S-1161, 1162, 1163 (N.H. 2000). The court records manifesting these procedures are part of the summary judgment record.

(because the term "owner" has no legal meaning in the context of a limited liability company (see n. 4, supra), and would have been limited to disclosing the company's members or managers (the only one of which known to the Secretary of State was Gidley)).[7]

A Justice of the Peace, whose impartiality Gidley does not challenge, found that Officer Oliveri's arrest warrant application and affidavit established probable cause, and the warrant issued.  Officer Oliveri arranged with Salem Manufactured Homes' counsel, Thomas Morgan, Esq., for Gidley to appear at the Salem Police Station at a time convenient for Gidley.[8]

When Gidley appeared with the company's counsel at the Salem police station, Officer Oliveri again asked his shift commander to assign a different officer to the booking procedure, and further asked that Mr. Gidley be issued a summons and released,

---

[7]  The court previously struck the Secretary of State's correspondence from the summary judgment record based on the defendants' well-taken foundational objection, see Fed. R. Civ. P. 56(e); Brown v. Town of Seabrook, 2008 DNH 196, 8-10, but in the spirit of viewing the evidence in the light most favorable to the plaintiff, see Part I, supra, the court will consider it. Regardless, even taking Gidley's view that Officer Oliveri did not receive confirmation of Gidley's ownership status, the issue is irrelevant.  The record reveals no more appropriate affiliate or officer of the company to undergo the booking-and-summons procedure described infra.

[8]  The time originally suggested by Officer Oliveri was not convenient for Gidley, so Officer Oliveri and Attorney Morgan agreed to a different time.

rather than being brought before the bail commissioner.[9]  This time, Officer Oliveri's requests were granted.  The other defendant in this case, Officer Juan Valerio, conducted the "booking-and-summons" procedure, which included the taking of photographs and fingerprints, as well as the elicitation of basic biographical information such as Gidley's date of birth and social security number.  No bail commissioner was asked to determine the conditions of any custody or set bail, and a summons to appear in court was issued--like the warrant--to the company "in care of" Gidley.  Attorney Morgan accompanied Gidley into the interior of the police station (though not the booking area), and they left when the booking-and-summons procedure was completed.  Prior to administering the booking-and-summons procedure, Office Valerio did not undertake an independent review of the criminal complaint or accompanying affidavit to independently determine whether it established probable cause.

Soon after the charges against Salem Manufactured Homes were initiated, a local newspaper, *The Salem Observer*, published a notice about the case.  Apparently based on a notation in the

---

[9]  A bail commissioner decides whether, and under what conditions, an arrestee is detained in custody or released pending arraignment in court.  N.H. Rev. Stat. Ann. § 597:18 (2003).

11

Salem Police Department's "blotter,"[10] the notice said that
Gidley had been arrested "on a warrant for illegal dumping."
This notice--the basis of Gidley's defamation claim--was
incorrect in two respects:  (1) that Gidley (as opposed to Salem
Manufactured Homes) had been charged, and (2) that the charge was
"illegal dumping" (as opposed to spillage).

Through Attorney Morgan, Salem Manufactured Homes eventually
moved to dismiss the case.  After requesting and receiving
additional time to consider its position, the state, through ACA
Blaszka, did not object and the case was dismissed.[11]

## III. **ANALYSYS**

### A.   **The federal civil rights claims (Counts 1 and 2)**

Counts 1 and 2, Gidley's claims under § 1983, allege false
arrest and false imprisonment in violation of his rights under

---

[10]   There is no evidence that either defendant entered, or
had any role in entering, the information in the police blotter.

[11]   Attorney Blaszka, who is no longer a prosecutor,
testified that the state agreed to the dismissal because he was
not in a position to prove that Gidley was the "owner" of Salem
Manufactured Homes.  Leaving aside the issue of whether the term
"owner" has any meaning in the context of a limited liability
corporation, see supra n.4, the rationale for this decision is
lost on the court.  Unlike a violation prosecution against the
truck driver involved, see N.H. Rev. Stat. Ann. § 266:72, III, a
misdemeanor case against the company did not require proof of any
affiliation with the company on Gidley's part, or, for that
matter, proof of the identity of any natural person.

the Fourth Amendment to the Constitution, which protects

individuals from, _inter alia_, unreasonable seizures.[12]  _See_ U.S.

CONST. amend. IV.[13]  As to these claims, the defendants claim an

entitlement to qualified immunity.  The court agrees; the

defendants are entitled to that immunity first, because the

booking-and-summons procedure here did not implicate a "clearly

established" right.  Second, a reasonable police officer would

not have known that the procedure violated the Fourth Amendment.

   In cross-moving for summary judgment, the parties have

"abjure[d] any claim that a trialworthy factual dispute exists"

as to the § 1983 claims.  _See_ _Cox v. Hainey_, 391 F.3d 25, 29 (1st

---

   [12]  In his summary judgment memorandum, Gidley cites _Pena-Borrero v. Estremeda_, 365 F.3d 7 (1st Cir. 2004), for the proposition that false arrest and false imprisonment are properly treated as components of a single Fourth Amendment violation. After confirming his position at oral argument, the court will approach the issue as Gidley suggests, treating the federal claims in Counts 1 and 2, for summary judgment purposes, as a single challenge to the booking-and-summons procedure under the Fourth Amendment, _see_ _id._ at 13 n.8, rather than separately analyzing the concepts of, and distinctions between, "arrest" and "imprisonment" under the facts of this case.  The separate elements of false arrest and false imprisonment will be addressed only in the court's analysis of the state common law claims also asserted in Counts 1 and 2.  _See_ _infra_ Part III.B.1.

   [13]  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  _Id._  The Fourth Amendment applies to the states through the Fourteenth Amendment.

Cir. 2004).  "This posture is important because, in the absence of a genuine issue of material fact, a defendant's right to qualified immunity presents a question of law."  Id. (citing Rivera v. Murphy, 979 F.2d 259, 261 (1st Cir. 1992).

An affirmative defense placing the burden of proof on the defendants, Gomez v. Toledo, 446 U.S. 635, 640 (1980), "[t]he doctrine of qualified immunity provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties."  Whitfield v. Melendez-Rivera, 431 F.3d 1, 6 (1st Cir. 2005) (citing Anderson v. Creighton, 483 U.S. 635, 638 (1997)).  The doctrine "provides defendant public officials an immunity from suit and not a mere defense to liability."  Maldonado v. Fontanes, ___ F.3d ____, 2009 WL 1547737, *3 (1st Cir. June 4, 2009).  "[T]he qualified immunity inquiry is a two-part test.  A court must decide:  (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."[14]  Maldonado, 2009 WL 1547737, *4.

---

[14]  While the First Circuit Court of Appeals has frequently articulated this inquiry as a three-part test, the additional step amounts to a distinction without a difference.  The court of appeals has expressly abandoned the three-step analysis in favor

While <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), held that the implication <u>vel</u> <u>non</u> of a constitutional right "must be the initial inquiry," 533 U.S. at 201, the Supreme Court did away with that rigid requirement in <u>Pearson v. Callahan</u>, 129 S. Ct. 808 (2009). There, the Court concluded that "while the sequence set forth [in <u>Saucier</u>] is often appropriate, it should no longer be regarded as mandatory." <u>Id.</u> at 818. District courts now "have discretion to decide whether, on the facts of a particular case, it is worthwhile to address first whether the facts alleged make out a violation of a constitutional right." <u>Maldonado</u>, 2009 WL 1547737, *5. Exercising that discretion to pass on the question of whether Gidley's complaint makes out a violation of a constitutional right, the issue is whether the right was "clearly established" at the time of the defendants' alleged misconduct.

"[T]he second, 'clearly established' step of the qualified immunity analysis . . . has two aspects. One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation." <u>Id.</u> "The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." <u>Id.</u>

---

of the two-part test set forth above. <u>Maldonado</u>, 2009 WL 1547737, *4.

**1.   Clearly established right**

"Public officials are . . . entitled to qualified immunity
<u>unless</u> the facts establish that their conduct violated a
constitutional right that was 'clearly established' at the time
of the violation."   <u>Whitfield</u>, 431 F.3d at 6.   While the booking-
and-summons procedure involved here is one corporate or company
officers would prefer to avoid should their companies be
prosecuted, a Fourth Amendment right to be free of it was not
clearly established such that a reasonable police officer would
have been on notice of it.   The appropriate New Hampshire
procedure for proceeding was unclear, and constitutional
precedential authority unavailable.

"To overcome qualified immunity, the contours of the right
must be sufficiently clear that a reasonable official would
understand that what he is doing violates that right."
<u>Maldonado</u>, 2009 WL 1547737, *5, (quoting <u>Anderson v. Creighton</u>,
483 U.S. 635, 640 (1987)).   To Gidley, the analysis "boils down
to a straightforward, undisputed truth--[he] was arrested,
detained, and prosecuted for a crime of which [sic] he was never
accused of committing."   He cites black letter Fourth Amendment
law for a proposition that is essentially a truism:   that an
arrest must be supported by probable cause that the arrestee, and
not some other person, committed an offense.

"The operation of [the qualified immunity] standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." <u>Anderson</u>, 483 U.S. at 639.  Of course, it is true, at the highest level of generality, that the arrest of a person without probable cause "violates a clearly established right.  Much the same could be said of any other constitutional or statutory violation.  But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness'" required under the second component of the qualified immunity test.  <u>Id.</u> at 639.

Viewed in light of this Supreme Court guidance, this case presents a much narrower, more discrete scenario:  the submission of a limited liability company officer, in a misdemeanor prosecution of the company,[15] at a time and under circumstances convenient to him, to police identification procedures commonly

_____

[15]   It can not be seriously questioned--and has not been in this case--that what took place was a prosecution of Salem Manufactured Homes, and not of Gidley himself.  The warrant named the company as arrestee, listed its address (not Gidley's), and alleged a misdemeanor (not a violation), which by operation of law eliminated the possibility that the defendant was a natural person, subject only to a violation charge.  <u>See</u> N.H. Rev. Stat. Ann. § 266:72, III.

referred to as "booking,"[16] followed by the issuance of a summons
for the company to appear in court.[17]

It was by no means "clearly established" that the Fourth
Amendment prohibited what Gidley experienced here--the
fingerprinting, photographing, and routine non-investigatory
questioning for purely administrative purposes, of the only
identifiable natural person with an ownership interest in a
business organization in a criminal prosecution against the
entity.  Gidley advances what he describes as a "fundamental and
firmly rooted tenet of the United States justice system . . .
that a corporation cannot be arrested and imprisoned in either

---

[16]   When used as a verb in the context of law enforcement,
to "book" is "to enter the name and tentative charge against (a
person) usually in a police register."  WEBSTER'S THIRD NEW
INTERNATIONAL DICTIONARY 253 (Merriam-Webster, Inc. 2002).  It is
an "administrative step," and customarily "involves entry of the
person's name, the crime for which the arrest was made, and other
relevant facts on the police 'blotter' and which may also include
photographing, fingerprinting and the like."  BLACK'S LAW
DICTIONARY 166 (5th ed. 1979).  It does not, in and of itself,
involve detention or custodial interrogation, either customarily
or under the facts of this case.

[17]   It is unclear whether the summons required Gidley to
personally appear in court, or if some other corporate employee
would have sufficed.  As the only member and manager of Salem
Manufactured Homes, Gidley was the most likely candidate for that
as well.  Gidley does not actually challenge this aspect of the
procedure under § 1983, however (his malicious prosecution claim
lies under state law) so the question need not be addressed here.

civil or criminal proceedings."[18]  As the defendants point out,
however, "this is not so much a tenet or principle as an obvious
fact" that follows from the existence of a corporation as a legal
fiction.

A corporation, which is a jural person acting only through
its agent, cannot, of course, be physically arrested."  1 R.
McNamara, New Hampshire Practice, Criminal Practice and Procedure
§ 8.25 at 179 (4th ed. 2003).  Physically arresting a limited
liability company would be, as the New Hampshire Supreme Court
put it in the context of pinpointing the physical location of a
corporation, "like trying to handcuff a shadow."  New Hampshire
v. Luv Pharmacy, Inc., 118 N.H. 398, 404 (1978).  Thus, to bring
a corporation into court to answer a criminal charge, the common
law allowed the service of a summons upon the corporation's
principal officer.  10 William Meade Fletcher, Fletcher
Cyclopedia of Corporations, § 4962, at 739 (rev. ed. 2001).

New Hampshire law, however, "provides no specific procedure
for ensuring that corporate criminal defendants will be
forthcoming to answer for a crime."  1 McNamara, supra § 8.25 at
179.  The approach chosen by Officer Oliveri, which,

---

[18]  It bears pointing out again here that in this
"corporate" prosecution of a limited liability company, there was
never any chance that Gidley could be personally sentenced or
otherwise punished, much less imprisoned.  See note 15, supra.

19

significantly, was based on advice affirmatively sought from and provided by a county prosecutor assigned to the Salem Police Department, see infra at Part III.A.2., was to seek issuance of a complaint against the limited liability company "in care of" the defendant, and to arrange through the company's defense counsel for Gidley, the company's only identifiable officer and asset owner, to appear, accompanied by counsel, at the Salem police station to undergo a standard booking-and-summons procedure.

In substance, this procedure closely resembles the approach used at common law:  rather than being summoned to appear in court, Gidley was requested to appear--via discussions with his company's counsel--at the local police station.[19]  As the Fourth

---

[19]  Indeed, "[p]rosecutors in New Hampshire have generally relied upon the statutes that govern service of civil process upon corporations to provide corporations with notice of criminal charges."  1 McNamara, supra § 8.25 at 179.  While this precise process was not utilized in this case, the deposition testimony of both Officer Oliveri and Assistant County Attorney Blaszka strongly suggests that they were trying to approximate a summons-like procedure, as opposed to a physical arrest accompanied by the imposition of pre-arraignment custody or bail conditions. (See Oliveri deposition, p. 65 ("He was released on a summons.")); id. at 65-66 (describing the summons-without-bail procedure Oliveri requested of his supervising sergeant); Blaszka deposition, p. 62.  ("I didn't tell [Officer Oliveri] to go slap the cuffs on somebody, but I did mention that if there's an arrest warrant that has been obtained, he needs to go execute it or have someone from the department execute it.  . . . I don't recall, specifically, that I told him to go arrest Mr. Gidley, because an officer can either issue an old style summons or he can physically arrest the person . . . .  They could actually arrest somebody, book them, process them and not call the bail commissioner . . . .")).

Circuit Court of Appeals aptly put it, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) (citing Anderson, 483 U.S. at 639-40)). Here, Officer Oliveri was operating in just such a gray area, and he did not "guess" at all, let alone badly guess; he sought advice of counsel.  Even assuming--without deciding because it is by no means clear--that Officer Oliveri made a "bad guess" as to the least burdensome procedure for securing the attendance in court of a limited liability company charged with a crime, see infra at Part III.A.2., it cannot be said that established authority prohibited the method he chose.

"[T]he salient question is whether the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." Maldonado, 2009 WL 1547737 at *4 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)). The law provided no such fair warning to Officer Oliveri. Indeed, it endorsed one method--without foreclosing others--that is substantially similar to the one he employed.

"This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Hope, 536 U.S. at 741.  It is true that "officials can still be on notice that their conduct

21

violates established law even in novel factual circumstances."
Id. at 741.  It bears noting, however, that none of the players
in this drama--neither the Salem police officers assigned to the
case, nor the county prosecutor responsible for advising the
Salem Police Department, nor his superior in the Rockingham
County Attorney's Office, nor the Justice of the Peace who
reviewed the affidavit and issued the warrant (all of whom were
aware that the complaint charged a company "in care of" its
officer, and not a natural person, with a crime)--identified a
constitutional infirmity in the submission of a company officer
to routine criminal processing.

        Moreover, there is no evidence in the summary judgment
record that Attorney Morgan, a demonstrably able criminal defense
lawyer who successfully secured the dismissal of the charge,
raised any objection, constitutional or otherwise, to Gidley's
booking at the Salem police station.  Attorney Morgan, who
according to Gidley was representing both this company's
interests and his own, accompanied Gidley to the station and
remained on the premises during the procedure accompanying Gidley
into the interior of the station, beyond the waiting area.  While
the apparent approval of these individuals--including the
attorneys and the issuing magistrate--is not itself dispositive
of the qualified immunity issue, see respectively, Cox, 391 F.3d

                                22

at 35, and Malley v. Briggs, 475 U.S. 335, 344 (1986), it
strongly suggests the absence of any "clearly established" law
prohibiting the procedure undertaken by Officer Oliveri.

Buttressing the fact that New Hampshire law does not
expressly provide a method for initiating criminal process
against a corporation or other jural person to ensure its
presence in court, none of the litigants here provided the court
with constitutional authority prohibiting or authorizing the
method used in this case (other than Gidley's citation to the
Fourth Amendment itself--or inapposite decisions that apply its
protections at an impermissibly high level of generality for this
analysis, see Anderson, 480 U.S. at 639).   Nor has the court's
independent research revealed any such authority.   Thus, it
cannot be said that the state of the law gave Officer Oliveri
fair warning that his conduct was unconstitutional.   See
Maldonado, 2009 WL 1547737, *5.   Even if Gidley's complaint makes
out the bare allegation of a constitutional violation, then, the
right he asserts was not "clearly established."

### 2.   Reasonable defendant's understanding of conduct

Even assuming, arguendo, that the booking-and-summons
procedure as applied to an officer of a limited liability company
to answer for its crime implicated a clearly established right,

there is no reason to believe, based either on the evidence in
the record or common sense, that the officers would or should
have understood that their actions violated Gidley's
constitutional rights.  This "other aspect [of the qualified
immunity doctrine] focuses more concretely on the facts of the
particular case and whether a reasonable defendant would have
understood that his conduct violated the plaintiffs'
constitutional rights."  Maldonado, 2009 WL 1547737, *4.  "It is
important to emphasize that this inquiry 'must be undertaken in
light of the specific context of the case, not as a broad general
proposition.'"  Id. (quoting Brosseau v. Haugen, 543 U.S. 194,
198 (2004) (further internal quotation marks omitted)).

     Here again, the plaintiff operates at too high a level of
generality, "alleging violation of extremely abstract rights,"
Anderson, 483 U.S. at 639, that "the Fourth Amendment is violated
if the warrant is not supported by probable cause," and that the
officers "need only to have read the preamble to the form of the
affidavit/application [broadly defining probable cause]."

     First, however, not satisfied to limit his challenge to the
booking-and-summons procedure, Gidley pushes even further,
arguing that even the underlying prosecution against the company
was baseless:  "there was insufficient evidence upon which
Oliveri could have reasonably concluded that probable cause

existed for the charge against Salem Manufactured Homes."  But
his argument mischaracterizes the spillage statute, suggesting it
applies only when "an <u>uncovered vehicle</u> leaks material while
traveling on a way, and the speed of the vehicle is not 'less
than 30 miles per hour.'"  This completely reads paragraph I out
of the statute; that paragraph prohibits and criminalizes the
operation on a public way of any vehicle not loaded in such a way
as to prevent spillage, regardless of whether its load is
covered.  N.H. Rev. Stat. Ann. § 266:72, I; <u>see</u> <u>also</u> § 266:72, V
(exempting ¶ I from the speed requirement).[20]  Simply put,
Paragraph I prohibits spillage from a loaded vehicle, regardless
of speed, while Paragraph II prohibits operating a vehicle with
an uncovered load at a speed of 30 m.p.h. or greater, regardless
of spillage.

---

[20]  For reasons that are lost on the court, both parties
have devoted significant portions of their summary judgment
memoranda to the speed the truck was traveling when Ms. Leclair's
vehicle was pelted with its debris, and whether Officer Oliveri
investigated or considered the issue of the truck's speed.  The
speed issue is a red herring.  The arrest warrant affidavit
purported to establish probable cause under N.H. Rev. Stat. Ann.
§ 266:72, the spillage statute, and made no reference to any
paragraph or statutory variant of that offense.  Although the
truck's load was uncovered, potentially allowing for a
prosecution under ¶ II of the statute, which requires that the
truck be traveling at least 30 miles per hour, N.H. Rev. Stat.
Ann. § 266:72, V(c), the affidavit also established probable
cause under ¶ I of the spillage statute, which requires no such
proof of speed.  <u>See</u> <u>id.</u> § 266:72, I.

When the spillage statute is properly read, then, Officer
Oliveri's affidavit unquestionably established probable cause for
a ¶ I charge against Salem Manufactured Homes.  First, the
spillage statute expressly contemplates the criminal prosecution
of corporate entities and the like, providing that offenders
"shall be guilty of a violation if a natural person, or guilty of
a misdemeanor if any other person."  <u>Id.</u> § 266:72, III.  Probable
cause to obtain an arrest warrant exists when police have
knowledge of facts and circumstances grounded in reasonably
trustworthy information and sufficient in themselves to warrant a
belief by a prudent person that an offense has been committed.
<u>See</u> <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964); <u>see</u> <u>also</u> <u>Wong Sun v.</u>
<u>United States</u>, 371 U.S. 471, 479 (1963).  The affidavit set forth
the accounts of two eyewitnesses to the spillage in question,
cited physical evidence (a dented hood and cracked windshield)
that corroborated the eyewitness accounts, and connected the
spillage to the company through eyewitness accounts that the
truck bore the company's name, as well as Oliveri's own research
confirming that the truck was registered to the defendant
company.  It further contained a sufficient evidentiary basis for
Gidley's alleged "ownership" of the defendant company--although
this was irrelevant to the probable cause determination--through
statements of the company's receptionist to the complainant-

26

victim and Officer Oliveri himself.  Gidley eventually conceded
at oral argument that, under the applicable statutory variant of
the spillage statute, set forth in ¶ I of § 266:72, the existence
of probable cause is not a difficult question.  Probable cause to
support the corporate misdemeanor charge existed.

Gidley's real challenge, of course, is to the booking-and-
summons procedure as applied to an officer of the prosecuted
limited liability company.  Here, "the operative inquiry is not
whether the defendant's actions actually abridged some
constitutional right, but, rather, whether those actions were
obviously inconsistent with that right."  Cox, 391 F.3d at 31
(emphasis in original) (internal citations omitted); see also
Malley, 475 U.S. at 341 (qualified immunity protects "all but the
plainly incompetent or those who knowingly violate the law.");
Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officials are
immune unless "the law clearly proscribed the action" they took).
In light of an arrest warrant from a neutral and detached
magistrate for the company "care of" Gidley, and a discussion
with the company's defense attorney to arrange Gidley's booking,
the idea that any reasonable officer would have understood that
procedure to violate Gidley's clearly established rights under
the Fourth Amendment is fanciful, to say the least.  See Malley,
475 U.S. at 344-45.

27

This conclusion is buttressed by the fact, alluded to previously in the discussion of the abstract right implicated supra at Part III.A.1., that upon realizing he did not know how to effect the misdemeanor arrest of a limited liability company like Salem Manufactured Homes, Officer Oliveri sought the advice of the prosecutor assigned to the Salem Police Department.  See Cox, 391 F.3d at 31.  "Reliance on advice of counsel alone does not per se provide defendants with the shield of immunity." Sueirio-Vasquez v. Torregrosa de la Rosa, 494 F.3d 227, 235 (1st Cir. 2007).  Or, stated in the context of this case, "the mere fact that an officer secures a favorable pre-arrest opinion from a friendly prosecutor does not automatically guarantee that qualified immunity will follow."  Cox, 391 F.3d at 35.  But Cox established the rule in this circuit that consultation with counsel is "one factor, among many, that enters into the totality of the circumstances relevant to the qualified immunity analysis," and that such consultation has significance at two levels:  "both the fact of a pre-arrest consultation," and "the purport of the advice received."  Id.  Here, both factors further support a conclusion of objective reasonableness.[21]

---

[21]   To his credit, Gidley's counsel informed the court at oral argument that when the case was initially put into suit, he was unaware of ACA Blaszka's involvement.

28

First, the fact that Officer Oliveri affirmatively sought out ACA Blaszka's advice, coupled with his attempt to resolve the situation short of an enforcement action through two telephone calls to Salem Manufactured Homes, suggests a good faith attempt to proceed reasonably.  The point is further demonstrated by Officer Oliveri's arrangement, through Salem Manufactured Homes's counsel, of a booking-and-summons procedure at a time convenient for Gidley, rather than executing the arrest warrant through a physical arrest of Gidley at his home, office, or in a public place.  Second, Officer Oliveri followed ACA Blaszka's advice. While a procedure other than the booking-and-summons utilized here, such as the issuance of an information and service of the information with a summons might have been preferable in retrospect, that was not the advice Officer Oliveri received.

Furthermore, the advice was itself objectively reasonable, taking into consideration the spillage statute's applicability to non-natural persons such as business entities, the New Hampshire statute applicable to misdemeanor arrests, the County Attorney Office's policy requiring such misdemeanor arrests, and the consultation with a more senior supervisory county prosecutor. See Suerio-Vasquez, 494 F.3d at 236 ("This case does not involve advice from private counsel, who may have financial incentives to provide exactly the advice the client wants.")  It is also

29

noteworthy that ACA Blaszka advised that the warrant and its execution were <u>required</u> under the law.  <u>See</u> <u>id.</u> (advice from counsel that challenged conduct was required by Puerto Rican law contributed to finding of reasonableness).

It is not this court's function to determine whether ACA Blaszka's advice set out the best, or most airtight, possible course of action; "a reviewing court must determine whether the officer's reliance on the prosecutor's advice was objectively reasonable."  <u>Cox</u>, 391 F.3d at 35.  Given the totality of the circumstances, Gidley's argument that no reasonable police officer would have believed the advice conformed to the Constitution is unpersuasive.  Thus, even if this case involved a right clearly established under Supreme Court or First Circuit authority, <u>but</u> <u>see</u> Part III.A.1, <u>supra</u>, there is no basis to conclude that a reasonable officer would have understood that the conduct at issue here violated that right.  <u>Maldonado</u>, 2009 WL 1547737, *5.

These facts, viewed alongside and through the lens of the applicable law, do not permit a finding that Officers Oliveri and Valerio,[22] or any other reasonable officer, would have understood

---

[22]  Although the focus of the court's analysis has been Officer Oliveri's conduct, it goes without saying that if he is entitled to qualified immunity, Officer Valerio, whose entire involvement began and ended with the booking-and-summons

that this conduct violated a clearly established constitutional right of the plaintiff.  Accordingly, the defendants have established their right to qualified immunity.  The defendants are granted summary judgment on the federal civil rights claims in Counts 1 and 2.

**B.   The state law claims**

The parties, understandably, devoted the majority of their briefing to the § 1983 claims, which left little space, under the page limits imposed by the local rules,[23] for addressing Gidley's five common law tort claims.  Fortunately, because they involve many of the same issues as the civil rights claims, little additional analysis is necessary.

---

procedure itself, is also so entitled.  At oral argument, Gidley maintained that the decision by the court of appeals in <u>Wilson v. City of Boston</u>, 421 F.3d 45 (1st Cir. 2005), supported a claim against Valerio on the theory that <u>Wilson</u> requires an officer to independently verify whether probable cause exists before executing an arrest warrant.  <u>Wilson</u> comes nowhere near endorsing such a radical break when examining Fourth Amendment law; in fact, <u>Wilson</u> ruled that qualified immunity protected an official who mistakenly believed that a warrant to arrest the plaintiff existed.  <u>Id.</u> at 58-59.

[23]   LR 7.1(a)(3).

1.   **State law false arrest, false imprisonment, and malicious prosecution**

Three of the claims--false arrest, false imprisonment, and malicious prosecution--are closely related to each other, and to the § 1983 claims set forth in Counts 1 and 2, because they involve the very same conduct:  investigating and prosecuting Salem Manufactured Homes, and administering the booking-and-summons procedure to its officer, Gidley.  While these three common law torts have different elements under New Hampshire law, the argument Gidley advances simplifies matters.  He argues[24] that, in the context of this case, all three of these criminal procedure-based torts boil down to one question:  whether the officers purposely arrested, detained, and prosecuted Gidley for a crime he was never accused of committing.

For all the reasons set forth above, <u>supra</u> Part III.A.--the lack of clear guidance under New Hampshire law, <u>see</u> 1 McNamara, <u>supra</u> § 8.25 at 179, the lack of a clearly established constitutional right implicated by the booking-and-summons procedure, the advice of counsel (both in its pursuit and in its substance), Officer Oliveri's attempts to disassociate himself from the process, and the objective reasonableness of the

---

[24]  Gidley advanced this argument forcefully, albeit ultimately unsuccessfully, at oral argument.

32

administration of the procedure itself--eliminate the existence of any genuine issues of material fact, entitling the defendants to summary judgment as a matter of law on these claims.

An element-by-element analysis of the criminal justice-related torts, though unnecessary in light of Gidley's argument as set forth above, leads to the same conclusion.  A successful malicious prosecution claim requires, among other things, a lack of probable cause for the charge.[25]  See Paul v. Sherburne, 153 N.H. 747, 749 (2006).  ACA Blaszka's advice to Officer Oliveri, after receiving a full account of his investigation so far, conclusively establishes probable cause in this context.  See Hogan v. Robert H. Irwin Motors, Inc., 121 N.H. 737, 739 (1981) (citing, inter alia, Restatement (Second) of Torts § 666(1) (1977)).  While Oliveri could not avail himself of this rule unless he sought Blaszka's advice in good faith, see Restatement (Second) of Torts § 666(1)(a), there is no evidence to the contrary here--only conjecture based on Gidley's relationship with Oliveri's former sister-in-law and a few incidents of mildly harassing conduct, see note 2, supra.  That is insufficient to overcome summary judgment, particularly in light of Oliveri's

---

[25]It also requires, obviously, a prosecution of the plaintiff himself, which does not seem to be the case here, since it was Salem Manufactured Homes, not Gidley personally, who was charged.  See note 15, supra.

33

repeated efforts to recuse himself from the case.  Indeed, even
if there were a triable issue as to the defendants' malice, that
alone would not be sufficient to create a triable issue as to
probable cause, because "[a]n improper purpose of the accuser in
initiating . . . the proceeding is not evidence that he did not
have probable cause to do so."  Restatement (Second) of Torts
§ 669A(1).

Similarly, Gidley cannot prevail on his state-law false
arrest and false imprisonment claims, because the defendants had
lawful authority to arrest him (if that is in fact what they did)
in the form of a valid warrant for Salem Manufactured Homes "care
of" Gidley.  See Welch v. Bergeron, 115 N.H. 179, 181 (1975).

**2.   Infliction of emotional distress**

The defendants are also entitled to judgment as a matter of
law on Gidley's common law emotional distress claims. First, as
Gidley conceded at oral argument, he cannot prevail on his claim
for negligent infliction of emotional distress because he lacks
the requisite expert testimony that he suffered physical
manifestations of such distress brought on by the defendants'
conduct.  See, e.g., O'Donnell v. HCA Health Services of N.H.,
Inc., 152 N.H. 608, 611-12 (2005).

34

Second, assuming that this deficiency would not likewise be fatal to Gidley's claim for intentional infliction of emotional distress, he cannot succeed on that claim anyway because he cannot show that the defendants' conduct was "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Mikell v. Sch. Admin. Unit No. 33, ___ N.H. ___, 2009 WL 1352408, at *3 (N.H. May 15, 2009) (quoting Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)).  Again, Officer Oliveri simply initiated an investigation prompted by a citizen complaint; attempted to resolve the complaint informally with a call to Gidley's company; and, when that failed, sought the advice of a county prosecutor as to what to do next.  And Officer Valerio simply subjected Gidley to a booking procedure as contemplated by the warrant. These actions--even if technically illegal, which, as explained at length supra, is a tricky question in its own right--are at a considerable remove from the extreme and outrageous behavior necessary to impose liability for intentional infliction of emotional distress.  See, e.g., Konefal v. Hollis/Brookline Co-op. Sch. Dist., 143 N.H. 256, 261 (1998) (noting that "outrageous

conduct" contemplates "a great deal more" than simply "illegal and reprehensible conduct").[26]


3.    **Defamation**

As to defamation, the defendants are granted summary judgment for precisely the reason they advance.  Although the *Salem Observer's* "police blotter" notice certainly contained inaccurate information--it suggested that Gidley himself had been arrested, and that the charge was "illegal dumping"--there is no evidence whatsoever connecting those published inaccuracies to statements or other information-conveying conduct by the defendant officers.  Without that evidentiary connection, the defamation claim fails, entitling the defendants to summary judgment.  See Duchesnaye v. Munro Enterprises, Inc., 125 N.H. 244, 250 (1984); see generally Kasselve v. Gannet Co., 875 F.2d 935, 938 (1st Cir. 1989).

---

[26]Furthermore, though the defendants have not challenged Gidley's proof on this point, there is no suggestion that Gidley suffered "severe emotional distress" from his ordeal, which would independently doom this claim.  See Konefal, 143 N.H. at 261.

IV.  **CONCLUSION**

With due deference to Gidley and the zeal of his counsel's advocacy, the court cannot concur with the argument that this case--involving a misdemeanor prosecution for the spillage of dirt and pebbles from a dump truck--"goes straight to the heart of the integrity of our nation's criminal justice system." (Plaintiff's opposition to summary judgment memorandum, p. 1). All told, it is probably something less momentous than that. "Qualified immunity serves not only as a defense to liability but also as an entitlement not to stand trial or face the other burdens of litigation."  Cox, 391 F.3d at 29 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  "Seen in this light, many of the benefits of qualified immunity are squandered if an action is incorrectly allowed to proceed to trial."  Id.  The defendants are entitled to the benefits of the doctrine.[27]

---

[27]  Nothing in this ruling should be read to support the idea that, as a general proposition, New Hampshire law or the United States Constitution countenance the arrest and detention of company officers in criminal prosecutions of corporations, limited liability companies, and the like.  Preferable procedures were described supra.  The ruling here is that on these facts, and under the applicable law, the defendants are entitled to qualified immunity.

The defendants' motion for summary judgment[28] is GRANTED and the plaintiff's cross-motion for summary judgment[29] is DENIED. All other pending motions are DENIED AS MOOT.  The clerk is instructed to enter judgment for the defendants and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 25, 2009

cc:  Thomas W. Aylesworth, Esq.
     Eric N. Shor, Esq.
     Catherine M. Costanzo, Esq.

---

[28]   (Document no. 12).

[29]   (Document no. 14).

38